IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN THE MATTER OF THE SEARCHES OF:

| | |
|---|---|
| BLACK SAMSUNG CELLPHONE, BEARING IMEI 355820494991153 | Magistrate No. 23-1815 |
| INFORMATION ASSOCIATED WITH THE CELLULAR TELEPHONE ASSIGNED CALL NUMBER 412-701-8232 THAT IS CONTROLLED BY CINGULAR WIRELESS/AT&T | Magistrate No. 23-1816 |

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

I, Kevin A. Pacini, a Special Agent (SA) with the Federal Bureau of Investigation (FBI), being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      In my capacity as a SA with the FBI, I am an "Investigative or Law Enforcement Officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      I have been a SA with the FBI since November 2018 when I was assigned to the Pittsburgh Division of the FBI, Violent Crimes Task Force. In this capacity, I was charged with conducting federal criminal violent crime investigations including drug and firearm violations, with a focus on armed robberies, specifically bank and commercial robberies. In October 2019, I was assigned to the Greater Pittsburgh Safe Streets Task Force ("GPSSTF"), which is a group of federal, state, and local agencies that work together in the Greater Pittsburgh area to focus investigative resources on violent crimes and related offenses. During my assignment with the

1

GPSSTF, I investigated violent street gangs and other organizations involved in drug trafficking offenses in the Western District of Pennsylvania. In January 2023, I was again assigned to the Violent Crimes Task Force, where I currently focus on investigations involving robberies of financial and commercial institutions, unlawful use and possession of a firearm and narcotics trafficking in the Western District of Pennsylvania.

3.      I have been involved in many bank robbery, Hobbs Act robbery, narcotics, firearm, and gang-related investigations as well as the service of many robbery, narcotics, firearm, and gang-related search and arrest warrants. During my investigative career with the FBI, I have had experience conducting physical surveillance, analyzing telephone records, interviewing witnesses, executing search and arrest warrants, and other investigative techniques. The investigations in which I have participated have resulted in the arrest and prosecution of individuals who have committed armed robberies of banks and other commercial institutions, committed firearm offenses, and distributed controlled substances. I am familiar with methods used by individuals who committed robberies of financial institutions, methods used by individuals to disguise themselves during robberies, and methods used by individuals following robberies to conceal their identities and involvement in a robbery from law enforcement.

**PURPOSE OF AFFIDAVIT**

4.      This Affidavit is made in support of an application for search warrants authorizing the following searches:

> a.   **Black Samsung cellphone, bearing International Mobile Equipment Identity (IMEI) number 355820494991153 (SEARCH LOCATION 1),** believed to be associated with the phone number 412-701-8232, used by DWAYNE HARVEY (HARVEY), which is further described in Attachment A-1, for items specified in

Attachment B-1; and

    **b.**  **Historical Cell Site Location and Account Records** for the cellular telephone number **412-701-8232**, maintained by the cellular service provider CINGULAR WIRELESS/AT&T, with an unknown subscriber, and used by HARVEY (**SEARCH LOCATION 2**), and which is further described in Attachment A-2, for items specified in Attachment B-2.

    5.    Specifically, the purpose of this application is to seize evidence, fruits, contraband and instrumentalities more particularly described in Attachments B-1 and B-2, for violations of 18 U.S.C. § 2113, related to whoever, by force or violence, or by intimidation, takes money belonging to a bank, credit union or savings or loan association (the TARGET OFFENSE).

    6.    The statements in this Affidavit are based on part, on information provided by witnesses, detectives, officers, other agents and your Affiant's investigation into this matter.  Since this Affidavit is being submitted for the limited purpose of securing search warrants, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish probable cause to believe that the evidence, fruits, and instrumentalities of the violation of the TARGET OFFENSE are presently located at/on SEARCH LOCATION 1 and SEARCH LOCATION 2.

### FACTS ESTABLISHING PROBABLE CAUSE

    7.    On July 28, 2023, the FBI and local police responded to a robbery of a branch of Huntington Bank, located at 355 Lincoln Highway, North Versailles, PA 15137.  On August 8, 2023, there was a second robbery at a branch of Citizen's Bank, located at 106 Sandusky St., Pittsburgh, PA 15212.  The investigations ultimately identified Dwayne HARVEY as a suspect for both robberies.

3

8.      On August 14, 2023, The Honorable Maureen P. Kelly authorized a search warrant for HARVEY's residence at the YMCA, 600 W. North Ave, Apartment #420, Pittsburgh, PA 15212.  The facts set forth in support of that warrant are found in the affidavit of probable cause filed on August 14, 2023, at Magistrate No. 23-1310 and are incorporated herein.  FBI Special Agents, Task Force Officers, and Pittsburgh Bureau of Police Detectives served the warrant at HARVEY's address the same day.  The search and items seized are described in more detail below. Among the items seized from HARVEY's apartment was a black Samsung cell phone, *i.e.*, SEARCH LOCATION 1.  A photo of that phone from the apartment is below.



9.      On September 26, 2023, a Grand Jury sitting in the Western District of Pennsylvania returned a two-count Indictment, charging HARVEY with violating 18 U.S.C. § 2113(a) by robbing Huntington Bank of approximately $4,611 on July 28, 2023, and by robbing Citizen's Bank of approximately $3,348 on August 8, 2023.  *See* case 2:23-cr-00209-WSH.

Huntington Bank Robbery – July 28, 2023

10.     On July 28, 2023, at approximately 12:02 pm, the Huntington Bank, located at 355 Lincoln Highway, North Versailles, PA 15137, was robbed of approximately $4,611.00, by a black male wearing dark pants, a long sleeved red shirt, black baseball hat, and white medical mask.

11.     Upon entering the bank, the suspect loiters in the bank lobby, pacing back and forth while waiting in line.  During this time, he pulls his phone from a pocket, appears to manually manipulate it, holds it to his right hear for approximately 20 seconds, and then places the phone back in his pocket.  The below photos are still shots of the above described action, taken from the Huntington Bank video surveillance.



5





12.     The suspect then went to the teller window and asked for a deposit slip.  The teller provided him a deposit slip and the suspect began to fill it out.  A short time later, the suspect re-approached the teller and provided the deposit slip which read, in summary: "fill the bag with money now."

13.     Additionally, the suspect provided a blue zippered bag to the teller, who began

filling the bag with U.S. currency.  While the employee was filling the bag, the suspect stated, "I want it all."  The teller proceeded to empty all of the money from the drawer into the bag.

14.     An explosive dye pack was included within the money as well as four (4) "bait bills" – that is, money with pre-recorded serial numbers.

15.     Witnesses outside of the bank reported that they observed a black male wearing a long-sleeved red shirt, black pants, black hat, face mask and carrying a blue bag run from the direction of the bank, past the Wendy's restaurant located in the same parking lot/plaza as the bank, 351 Lincoln Highway, North Versailles, PA 15137.  The subject continued to run across Warren Drive, to the Eat 'N Park, located at 299 Lincoln Highway, North Versailles, Pa 15137 (intersection of Warren Drive and Lincoln Highway).  The suspect then picked up a bicycle from bushes at the Eat 'N Park and began to ride out of the restaurant's parking lot and onto Lincoln Highway.

16.     While the suspect was riding away on the bike, witnesses reported that they observed an explosion of a pinkish substance coming from the bag he was carrying, which caused the suspect to crash the bicycle.  The suspect got back onto the bicycle and continued riding down Lincoln Highway.

17.     Law enforcement located the bicycle leaning on a tree in the 600 block of Linden Ave in the Borough of East Pittsburgh, near the Linden Grove Apartments.  On the bicycle's handlebars was a pinkish substance that appeared consistent with the exploding dye pack.

18.     Investigators also located and seized a black baseball hat on the shoulder of Lincoln Highway, along the path the suspect took fleeing from the robbery, which matched the description of the hat worn by the suspect during the robbery.

19.     Investigators obtained additional video surveillance, from several locations, and

were able to backtrack the bank robbery suspects locations prior to the robbery.

20.     Specifically, the suspect got onto Pittsburgh Regional Transit Bus #6733 after loading a bicycle on the front rack.  The bus is equipped with interior and exterior cameras which showed the suspect exiting the entrance to General Braddock Towers prior to getting on the bus. The suspect is observed to be wearing a white baseball cap, red short sleeve shirt and long black pants at this time.

21.     Video from inside General Braddock Towers revealed that the suspect retrieved the bicycle from an unknown individual that resided in an apartment on the 8th floor of the apartment building.

22.     The suspect rode the bus from General Braddock Towers to the North Versailles Wal-Mart, located at 100 Wal-Mart Drive, where he is observed getting off the bus and taking the bicycle off the front rack, before entering the Wal-Mart.  The suspect then walks to the back of the store and enters a bathroom.  The suspect then is observed exiting the bathroom wearing a red long-sleeved shirt, black pants, black baseball cap, and a white medical facemask.

23.     On August 9, 2023, investigators identified and interviewed the individual from whom the suspect obtained the bicycle utilized in the robbery. This individual explained that they recently let a friend they knew, only as "Wayne," borrow his bicycle.

24.     They also provided a phone number for "Wayne" as 412-701-8232.  An open-source database search revealed that this phone number is associated with Dwayne R. HARVEY, DOB 11/23/1967, residence of 600 W. North Ave, Pittsburgh, PA 15212.

<u>Citizen's Bank Robbery – August 8, 2023</u>

25.     On August 8, 2023, at approximately 12:20 pm, the Citizen's Bank, located at 106 Isabella St., Pittsburgh, PA 15212, was robbed of approximately $3,348.00, by a black male

wearing a grey hooded sweatshirt, grey pants, a blue medical mask, a black hat, and a red fanny pack style bag.

26.     The suspect entered the bank and stood in line near the lobby counter before he approached the teller station and asked for a deposit slip.  The teller provided the suspect with a deposit slip.  The suspect walked away from the teller station and returned, writing on the deposit slip, in summary: "fill up the bag no dye packets."

27.     The teller turned over all of the money in the cash drawer, which the suspect placed into a red fanny pack style bag.  The teller informed law enforcement that the suspect kept saying "hurry up."

28.     The teller provided a description of the suspect as a black male, late 30's-40's, approximately 5'9", wearing all black with a hat, medical mask, and a red fanny pack style bag.  However, a review of still photos of the suspect revealed that the suspect was wearing a grey hooded sweatshirt, grey pants, a blue medical mask, a black hat, and red fanny pack style bag.

29.     Investigators obtained video surveillance, from several locations, which, again, enabled investigators to observe the suspect after the robbery and locate additional pieces of evidence.

30.     For instance, video surveillance from the Warhol Museum, located at 117 Sandusky St., showed the suspect running on Sandusky St. and stopping to pick up a dark blue shoulder bag from a bush close to the intersection of Sandusky St. and General Robinson St.  As the suspect continued to flee, the suspect's medical mask fell to the ground.  Investigators located the mask, and placed into evidence.

31.     Thereafter, surveillance footage showed the suspect without the mask as well as running into a parking area, wearing clothing that matched the description of the suspect, hiding

between cars and reappearing wearing a white t-shirt, light blue hat, and work boots. Investigators located and seized, from this location, a grey sweatshirt that appeared to be the same as the sweatshirt worn by the suspect during the bank robbery.

32.     The suspect is last seen on Sandusky St., between Lacock and E. Commons. Two (2) Pittsburgh Regional Transit busses drove under the overpass at the time that the suspect was observed at that location. The suspect did not re-appear on the other side. The Port Authority Police provided investigators with video surveillance from the interior and exterior these busses.

33.     Video surveillance obtained from Pittsburgh Regional Transit bus 6301 depicts the suspect wearing a white t-shirt, light blue hat, blue shorts, work boots, and carrying what appears to be the same blue shoulder bad that the suspect picked up from the bushes after the robbery as described above. The suspect sits at the front of the bus and eventually opens the blue bag, which reveals a red fanny pack style bag. The suspect manipulates what appears to be U.S. Currency inside the red bag.

34.     The suspect is then observed exiting the bus at the intersection of Brighton Road and West North Ave. Surveillance cameras near the YMCA, located at 600 W. North Ave, show the suspect walking, at 12:28 pm, and then throwing something red into a wooded area next to 831 W North Ave. Investigators located and seized a red fanny pack style bag, which appeared to be the same type of bag used during the robbery.

35.     Additionally, the Port Authority video surveillance footage provided investigators with an image of the suspect that could be used to conduct a facial recognition search of the suspect, which identified HARVEY as the suspect.

36.     Investigators, determined, through a Pennsylvania Justice Network search, that HARVEY's address as of March 2023 is located the YMCA, 600 W. North Ave, #420, Pittsburgh,

PA 15212.  This YMCA location contains apartment units and provides neighborhood services.

37.     Based upon video surveillance and management, investigators confirmed that HARVEY resides at the TARGET RESIDENCE.

38.     Investigators also located a Pittsburgh Bureau of Police report from January of 2022, which documented that HARVEY had filed a report with PBP, while employed in the maintenance department at Allegheny Commons, and listed his phone number as 412-701-8232, which is the same number that the witness referenced above who loaned HARVEY his bike provided law enforcement.

Search of 600 W. North Ave, Unit 420, Pittsburgh, PA 15212 and Interview of HARVEY

39.     On August 14, 2023, at approximately 8:00 am, the Honorable Maureen P Kelly, United States Magistrate Judge in the Western District of Pennsylvania, signed and issued a warrant in Case No. 23-130, authorizing the search of 600 W. North Ave, Unit 420, Pittsburgh, PA, 15212.  This location was determined to be the residence of HARVEY.

40.     On the same date, and at approximately 10:20 am, the above referenced search warrant was executed.  After knocking and announcing on the residence door, HARVEY opened the door and was taken into custody on active Pennsylvania State Court arrest warrants.  HARVEY was transported to Pittsburgh Bureau of Police Headquarters, located at 1203 Western Avenue, Pittsburgh, PA 15233.  No other individuals were located inside the residence.  The residence was identified to be a single bedroom, studio style unit, with a closet.

41.     Dearing a search of HARVEY's residence, the following items of evidentiary value were located:

    a.  Blue "American Tourister" bag, which matched the appearance of the bag used in the August 8, Citizen's Bank robbery described above.

b.  Black Samsung cellphone (**SEARCH LOCATION 1)**, bearing IMEI 3558202494991153;

c.  A teal Florida Marlins hat, and a red and white Chicago Bulls hat, which match hats observed during a review of video surveillance footage on the individual believed to be HARVEY, before or following one of the robberies described above.

d.  Pittsburgh Transit Authority bus Pass with the name "Michael Lewis" on it and Pittsburgh Transit Authority Bus Pass 547597.  Based on information received from Pittsburgh Transit Authority, it is believed that HARVEY utilized the bus pass of the name Michael Lewis on it following the August 8, Citizen's Bank robbery;

e.  A teal "JM New York" bag, which contained what appeared to be red dye on it, and is believed to have been used by HARVEY during the July 28, Huntington National bank robbery.

42.  **SEARCH LOCATION 1** was located on a crate, next to the bed in the residence. Following the search, your Affiant was able to confirm that the **SEARCH LOCATION 1** was associated with 412-701-8232 by placing a phone call to that number.  When the call was made, **SEARCH LOCATION 1** began to ring and displayed the phone number your Affiant was utilizing to make the call.

43.  When SEARCH LOCATION 1 was seized on August 14, 2023, it was initially transported to Pittsburgh Bureau of Police Headquarters, located at 1203 Western Ave, Pittsburgh, PA.  SEARCH LOCATION 1 remained in a locked vehicle while your Affiant went into the building to execute a separate search warrant for the DNA of HARVEY.  After approximately an hour and twenty minutes, the phone was transported from Pittsburgh Bureau of Police headquarters to the FBI Pittsburgh Field Office, located at 3311 E. Carson St., Pittsburgh, PA 15203 with no

stops or deviations in travel.  Upon arrival, the item was packaged and submitted to an Evidence Control Technician.  Since that time, it has remained in the control and custody of the FBI, within the FBI Pittsburgh Field Office.

44.     HARVEY was interviewed at Pittsburgh Bureau of Police Headquarters.  During the interview, police showed HARVEY photographs from inside the Citizen's Bank and surveillance from a nearby business of the individual that committed the Citizen's Bank robbery on August 8, 2023.  HARVEY denied he was in the photo.  HARVEY was shown a photo taken from surveillance on a Port Authority Bus following the robbery of the Citizen's Bank.  The individual depicted is believed to be the person that robbed the bank.  HARVEY identified himself in the photograph.  Police explained to HARVEY that all of the photos were related to the robbery investigation, but he denied any knowledge.

45.     HARVEY was next shown a series of photographs related to the July 28 Huntington National bank robbery.  In one of the photos, which depicted the bank robbery suspect on a bike carrying a blue bag following the robbery.  HARVEY stated that the individual "looks like me" and he pointed to a blue shoulder bag that he indicated he owned.

46.     Based on my training and experience, I know that cellphones, with the advent of smart phones and advanced technology, offer a wide range of capabilities, and revolutionized the way that people communicate.  Cell phones have become an integral part of daily life and how people communicate, including the use of calls, voicemails, text messaging, emails, and applications, to conduct research, business transactions, banking transactions, and navigate, among other things.  I also know that people that own cell phones generally use and carry their cell phones with them on a daily basis.

47.     Based on my training and experience I know that individuals that commit robberies

such as those referenced above, utilize their cellphones to conduct searches of potential robbery locations, conduct searches following robberies to determine whether law enforcement has identified any suspects, make phone calls or send text messages to others individuals regarding the the planning, execution, or getaway from a bank robbery, and bring cell phones with them when committing a robbery, which may contain certain location information of the cell phone that can corroborate that the individual committed the robbery

48.     Additionally, based on my training and experience, I know that individuals that commit robberies such as those described above often take photos of the bank robbery proceeds i.e. "trophy photos". Further, additional photos of individuals are often saved on phones that may depict items utilized in the robbery, such as clothing, bags, bikes, vehicles, etc.

49.     In this case, police identified images of the robbery suspect utilizing a cell phone during the Huntington Bank robbery on July 28, 2023, as depicted above. Additionally, the individual who let "Wayne" borrow his bicycle indicated that "Wayne's" phone number was the same number that your affiant determined is associated with SEARCH LOCATION 1, which was seized from HARVERY's apartment.  As described above, "Wayne's" phone number is D*WAYNE* HARVEY's number, and "Wayne" used the bicycle for transportation to and from the Huntington Bank robbery.

50.     Based on the above information, there is probable cause to believe that HARVEY participated in the planning and execution of the July 28, 2023, Huntington National bank robbery and the August 8, 2023, Citizen's bank robbery.  There is also probable cause to believe that the cell phone seized on August 14, 2023, during the search of 600 W. North Ave, Unit 420, Pittsburgh, PA 15212. would constitute evidence of the robberies under investigation, by revealing the location of the device's user on the dates of the robberies.  Cell-site location data may similarly

help investigators identify additional locations and individuals associated with the robberies being investigated.

51.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Storing this information can be intentional, for example, by saving an e- mail as a file on a computer or saving the location of one's favorite websites in "bookmarked" files. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or a cell phone. In addition to electronic communications, a user's Internet activities generally leave traces in the web cache and Internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device.

52.     Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they often can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet

are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

53.     In my training and experience, I have learned that CINGULAR WIRELESS/AT&T is a company that provide cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate location of the cellular telephone but is typically less precise than other types of location information, such as E-911 Phase II data or Global Positioning Device ("GPS") data.

54.     Based on my training and experience, I know that CINGULAR WIRELSS/AT&T can collect cell-site data about the SEARCH LOCATION 1.  I also know that wireless providers such as CINGULAR WIRELSS/AT&T typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use

16

this information for various business-related purposes.

55.     Based on my training and experience, I know that wireless providers such as CINGULAR WIRELSS/AT&T typically collect and retain information about their subscribers in their normal course of business.  This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless telephone service.  I also know that wireless providers such as CINGULAR WIRELSS/AT&T typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular phone and other transactional records, in their normal course of business.  In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify or confirm the device user or users and may assist in the identification of co-conspirators and/or victims.

## CONCLUSION and AUTHORIZATION REQUEST

56.     Based on the information set forth herein, I respectfully submit that there is probable cause to believe that evidence, fruits, contraband and instrumentalities of a violation of the TARGET OFFENSE will be found in SEARCH LOCATION 1 and SEARCH LOCATION 2 as described herein and more fully described in Attachment A-1 and Attachment A-2

57.     Your Affiant, therefore, respectfully requests that the attached warrants be issued, authorizing the search and seizure of the items identified in the attachments hereto.

58.     I further request that the Court direct CINGULAR WIRELSS/AT&T to disclose to the government any information described in Section I of Attachment B-2 that is within its possession, custody, or control.  Because the warrant will be served on CINGULAR

WIRELSS/AT&T, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

59.     Your Affiant will execute the warrant within the time limit authorized by the Court under Rule of Criminal Procedure 41(e).  The examination of TARGET LOCATION 1 will begin within the period authorized by the warrant.  However, your Affiant cannot attest to the length of time it will take for forensic analysis of TARGET LOCATION 1, or how long it will take CINGULAR WIRELESS/AT&T to disclose responsive data, which may exceed fourteen days.

The above information is true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,

*/s/ Kevin A. Pacini*
Kevin A. Pacini
Special Agent, FBI

Sworn and subscribed before me, by telephone
pursuant to Fed. R. Crim. P. 4.1(b)(2)(A),
this 1st day of December 2023.

_____
HONORABLE MAUREEN P. KELLY
United States Magistrate Judge
Western District of Pennsylvania

**Attachment A-1**

**SEARCH LOCATION:** Black Samsung cellphone, bearing IMEI 355820494991153, seized during the search of HARVEY's residence, 600 W. North Ave, Unit 420, Pittsburgh, PA 15212 on August 14, 2023.



**Attachment B-1**

<u>Items to be Searched for and Seized</u>

Any and all evidence, instrumentalities, fruits, and contraband relating to violations of Title 18, United States Code, Section 2113, including but not limited to:

1)      Cellphone numbers, email addresses, actual names, physical addresses, social media accounts, and other contact information for HARVEY;

2)      Any and all information that could be used to determine the ownership of the cellular telephones, including the cellular telephones' numbers;

3)      Any and all information that could be used to determine the identities of all the users of the cellular telephones;

4)      Any and all communications of any kind (*e.g.*, text, call records, emails, and voicemails), relevant to the TARGET OFFENSE;

5)      Internet searches, calendar/datebook entries, maps and directions, audio, pictures, and videos, relevant to the TARGET OFFENSE; and,

6)      Any and all GPS or location information relevant to the TARGET OFFENSE.

7)      Evidence of who used, owned, or controlled the cell phone at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

8)      Evidence indicating how and when the cell phone was accessed or used to determine the chronological context of cell phone access, use, and events relating to crimes under investigation and to the computer user;

9)      evidence of the attachment to the cell phone of other storage devices or similar containers for electronic evidence;

10)     evidence of the times the cell phone was used;

11)     records of or information about Internet Protocol addresses used by the cell phone;

12)     records of or information about the cell phone Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

In searching the cell phone, the federal agents may examine all of the data contained in the cell phone to view its precise contents and determine whether the cell phone and/or data falls within the items to be seized as set forth above.  In addition, they may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth above.

**Attachment A-2**

**Search Location**: This warrant applies to records and information associated with the cellular telephone assigned call number 412-701-8232 ("the Account"), from July 26, 2023 to August 14, 2023, that are stored at premises controlled by CINGULAR/WIRELESS ("the Provider"), at 11760 U.S. Highway 1, Suite 300, North Palm Beach, FL 33408.

### Attachment B-2

Items to be Searched for and Seized

I.     **Information to be Disclosed by the Provider**

II.           **Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A-2 is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A for the time period September 15, 2018 through November 7, 2018:

a.  The following information about the customers or subscribers of the Account:

   i.  Names (including subscriber names, user names, and screen names);

   ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.  Local and long distance telephone connection records;

   iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.  Length of service (including start date) and types of service utilized;

   vi.  Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

       viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records.

b.  All records and other information relating to wire and electronic communications sent or received by the Account, including:

       i.  Records of user activity for each connection made to or from the Accounts, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; usernames; and source and destination Internet Protocol addresses;

       ii.  Information about each communication sent or received by the Accounts, including the date and time of the communication, the method of communication, content of the communication, and the source and destination of the communication (such as source and destination email addresses, IP addresses, and telephone numbers);

       iii.  All data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from each cellular telephone or device assigned to the Accounts, to include all voice, SMS, MMS, data activity, and time on tower reports;

       iv.  All records containing round-trip-distance measurements and/or timing advance information and/or time on tower reports for each connection made to or from the Accounts (GSM, CDMA, EVDO, UMTS, LTE, 5G, etc.), to include NELOS, LOCDBOR, RTT, True Call Measurement Data, PCMD records, and Reveal Reports.

c.  All incoming and outgoing voicemail recordings and text message content associated with the Account(s).